## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DEBORAH D. CRANKFIELD, :
:
       Plaintiff :   No. 3:12-CV-00535
:
   vs. :   (Judge Nealon)
:
CAROLYN W. COLVIN, ACTING :
COMMISSIONER OF SOCIAL :
SECURITY, :
:
      Defendant :

**FILED**
**SCRANTON**

NOV 1 2 2013

PER _____
          DEPUTY CLERK

### MEMORANDUM

### BACKGROUND

      The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Deborah D. Crankfield's claim for social security supplemental security income benefits.

      Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

      Crankfield protectively filed[1] her application for supplemental security income benefits on June 24, 2009. Tr. 14, 52 106-109 and 132.[2] The application was initially denied by the

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative

                                (continued...)

Bureau of Disability Determination[3] on September 29, 2009. Tr. 14 and 53-57.  On November 25, 2009, Crankfield requested a hearing before an administrative law judge. Tr. 14.  After 10 months had passed, a hearing was held before an administrative law judge on October 4, 2010. Tr. 14 and 25-50.  On October 27, 2010, the administrative law judge issued a decision denying Crankfield's application. Tr. 14-21.  As will be explained in more detail *infra* the administrative law judge found that Crankfield could perform a limited range of unskilled, light work.  On November 8, 2010, Crankfield filed a request for review with the Appeals Council. Tr. 10.  After more than 14 months had passed, the Appeals Council on January 27, 2012, concluded that there was no basis upon which to grant Crankfield's request for review. Tr. 1-6.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Crankfield then filed a complaint in this court on March 24, 2012.  Supporting and opposing briefs were submitted and the

2.  (...continued)
record filed by the Defendant as part of the Answer on June 13, 2012.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration.  Tr. 53.

appeal[4] became ripe for disposition on August 10, 2012, when Crankfield filed a reply brief.

Crankfield, who was born in the United States on March 13, 1973,[5] testified at the administrative hearing that she withdrew from school during the 10th grade and that after withdrawing from school she did not obtain a General Equivalency Diploma. Tr. 30, 52 and 106. Id. Crankfield claimed that she was in special education classes and that she had difficulty with reading, spelling and math. Id. However, other documents in the record, some completed by Crankfield, are inconsistent with respect to her academic achievements and abilities. Tr. 137, 159, 202 and 256. Specifically, there are documents that indicate she withdrew from school during the 11th grade as well as completed the 11th grade and obtained a General Equivalency Diploma; and she can read, write, speak and understand the English language and engage in basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 202, 256, 137 and 159. The administrative

---

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

5. At all times relevant to this matter Crankfield was considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual age 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

law judge found that Crankfield had a limited education and could communicate in English which finding is supported by the record. Tr. 20.

Although Crankfield has a 14-year employment history (1989, 1990, and 1998 through 2009) she has no past relevant employment[6] because all of the positions (which included cleaning, housekeeping and cashier positions) were of relatively short duration and her earnings never rose to the level of substantial gainful activity. Tr. 19, 111 and 175-181. Crankfield's total reported earnings during those 14 years were $16,868.36. Tr. 111.

Crankfield claims that she became disabled on February 1, 2003, because of mental impairments. Tr. 137; Doc. 11, Plaintiff's Brief, p. 3. The mental impairments alleged are bipolar disorder,[7] panic disorder with agoraphobia[8] and major

---

6. Past relevant employment in the present case means work performed by Crankfield during the 15 years prior to the date her claim for supplemental security income benefits was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. According to the National Institute of Mental Health's website

> [b]ipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time. Bipolar disorder symptoms can result in damaged relationships, poor job or school performance, and even suicide. . . .
>
> People with bipolar disorder experience unusually

(continued...)

depressive disorder.[9] Id. Crankfield testified that she had various difficulties when she worked including arguing with and getting along with people, getting angry, not arriving at work on time, being around people, and not completing work tasks because of frustration. Tr. 33-34. Crankfield does not claim that she is disabled because of a physical condition.

Crankfield's alleged disability onset date of February 1, 2003, has no impact on Crankfield's application for

---

7.  (...continued)
        intense emotional states that occur in distinct periods called "mood episodes."  An overly joyful or overexcited state is called a manic episode, and an extremely sad or hopeless state is called a depressive episode.  Sometimes, a mood episode includes symptoms of both mania and depression. . .

http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml (Last accessed November 5, 2013).

8.  According to the National Institute of Health's website

        Panic disorder with agoraphobia is an anxiety disorder in which a person has attacks of intense fear and anxiety. There is also a fear of being in places where it is hard to escape, or where help might not be available.  Agoraphobia usually involves fear of crowds, bridges or of being outside alone.

Panic disorder with agoraphobia, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (Last accessed November 5, 2013).

9.  Major depressive disorder and bipolar disorder are classified as mood disorders and panic disorder with agoraphobia as an anxiety disorder. Diagnostic and Statistical Manual of Mental Disorders, 345 & 429 (4th ed. 2000)(Text Revision).

supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See 20 C.F.R. § 416.501. As stated above, Crankfield protectively filed her application on June 24, 2009. Consequently, Crankfield is not eligible for SSI benefits for any period prior to July 1, 2009.

For the reasons set forth below, the court will remand the case to the Commissioner for further proceedings.

**STANDARD OF REVIEW**

When considering a social security appeal, the court plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported

by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and

"must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work. For
purposes of the preceding sentence (with respect to any
individual), "work which exists in the national economy"
means work which exists in significant numbers either in
the region where such individual lives or in several
regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating supplemental security income claims. See 20 C.F.R. §
416.920; Poulos, 474 F.3d at 91-92. This process requires the
Commissioner to consider, in sequence, whether a claimant (1) is
engaging in substantial gainful activity,[10] (2) has an impairment
that is severe or a combination of impairments that is severe,[11]

---

10. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit." 20 C.F.R.
§ 416.910.

11. The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id. If a claimant has any
severe impairments, the evaluation process continues. 20 C.F.R.
§ 416.920(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the
subsequent steps of the sequential evaluation process. 20 C.F.R.
§§ 416.923 and 416.945(a)(2). An impairment significantly limits
a claimant's physical or mental abilities when its effect on the
claimant to perform basic work activities is more than slight or
minimal. Basic work activities include the ability to walk,
stand, sit, lift, carry, push, pull, reach, climb, crawl, and
handle. 20 C.F.R. § 416.945(b). An individual's basic mental or
non-exertional abilities include the ability to understand, carry
out and remember simple instructions, and respond appropriately
to supervision, coworkers and work pressures. 20 C.F.R. §
(continued...)

9

(3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

11. (...continued) 416.945(c).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

## MEDICAL RECORDS

Before the court addresses the administrative law judge's decision and the arguments of counsel, Crankfield's medical records will be reviewed in detail.

From January 18, 2007, through July 26, 2010, Crankfield had 36 appointments with various medical professionals at Penn State Hershey Medical Center regarding physical conditions. Tr. 244-245, 248-249, 251-252, 298-319 and 322-361. There were no mental status findings set forth in the medical notes of the 36 appointments. The notes of those appointments do not give any indication that Crankfield was suffering from psychiatric impairments other than that the notes of eight of the appointments indicate that Crankfield was prescribed several psychotropic medications, including the antidepressant medication Celexa. Tr. 298, 300, 302, 330, 332, 334, 336 and 349.

On December 11, 2008, Crankfield had an appointment with James C. Miller, D.O., at the Hershey Medical Center, apparently for depression although the treatment note does not specifically state that Crankfield's complaint was depression. Tr. 250. It merely indicates that she was there "to discuss her current meds" and "concerned that she might be bipolar" because she "seem[ed] to have mood swings during the day." Id. Dr. Miller did not give a definitive diagnosis but could not rule out bipolar disorder and

.

noted a history of depression, fatigue and malaise. Id. Dr. Miller continued Crankfield on the drug Celexa. Id.

On December 22, 2008, Crankfield called Dr. Miller's office requesting that they provide her with a note stating that she could "not go to school thru job program due to her depression." Tr. 225. The note is barely legible but appears to indicate that Dr. Miller's response was that Crankfield needed to continue with her normal routine. Id.

On April 16, 2009, Crankfield was interviewed by a mental health intake case worker at the Case Management Unit for Dauphin County. Tr. 281 and 285-294. Crankfield complained of depression and that Celexa was not helping. Tr. 282, 285 and 291. The intake case worker conducted a mental status examination and noted that Crankfield's appearance was appropriate; her eye contact was good; her speech was normal and soft; her motor behavior was calm; her mood was depressed; her affect was appropriate; her thought process was logical and coherent; her thought content was appropriate; her memory was good; her insight was fair; her judgment was poor; she was oriented to person, place and time; her motivation for treatment was good; and her response to the interview was cooperative. Tr. 293-294. When asked whether she used drugs other than for medical reasons, Crankfield's answer

was "No." Tr. 284. Crankfield specifically denied the use of alcohol and illegal drugs. Tr. 290.

On June 3, 2009, Crankfield was interviewed by a therapist at T.W. Ponessa & Associates Counseling Services (hereinafter referred to as "T.W. Ponessa") and a treatment plan was initiated. Tr. 202-204. The plan states that Crankfield suffered from bipolar disorder and that her Global Assessment of Functioning (GAF) score was 55.[14] Tr. 202. A psychiatrist signed the treatment plan on June 5, 2009, but there is no indication

---

14. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

that Crankfield was interviewed by that psychiatrist on June 3, 2009.[15] Tr. 204. During the interview with the therapist, Crankfield denied any use of illegal drugs or alcohol. Tr. 203. It was noted in the plan that Crankfield was receiving psychiatric medications through her family physician. Id. The treatment plan contained a recommendation that Crankfield be evaluated at T.W. Ponessa by a psychiatrist. Id.

On June 9, 2009, Crankfield had an appointment with Kevin J. Poole, M.D.,[16] at Hershey Medical Center regarding her complaints of depression. Tr. 320-321. The record of this appointment indicates that Crankfield was taking 40 mg of Celexa daily but contains no mental status examination findings. Tr. 320. Crankfield did complain of decreased appetite, mood changes, the inability to focus and concentrate and severe fluctuations in mood. Id. She denied any homicidal or suicidal ideations. Id. Dr. Poole's assessment was that Crankfield suffered from anxiety and depression and that she was disabled. Id. On the same day, Dr. Poole completed a form entitled "Medical Assessment Form" for the Pennsylvania Department of Public Welfare in which he stated

---

15. The signature of the psychiatrist is illegible.

16. Dr. Poole is a specialist in family medicine. Find a Physician, PennState Hershey, Milton S. Hershey Medical Center, http://www.pennstatehershey.org/findaprovider/provider/1846 (Last accessed November 5, 2013).

that Crankfield suffered from major depression and bipolar disorder and that Crankfield suffered from a mental condition which was expected to last for 12 months or more and which precluded employment. Tr. 128 and 131.

On June 30, 2009, Crankfield had an appointment with Dr. Miller at Hershey Medical Center regarding the following physical conditions: a lump above the right eye, diarrhea and an irregular menstrual period. Tr. 246-247. Dr. Miller noted that Crankfield was currently taking Celexa, 40 mg daily. Tr. 246. The medical record does not contain any mental status findings. Id. Dr. Miller's diagnosis was bipolar disorder and "a small sebaceous cyst above the right eye" which did not appear infected. Id. Dr. Miller prescribed Immodium A-D and directed her to follow with psychiatry. Id.

On July 1, 2009, Crankfield was evaluated by Samuel J. Garloff, D.O., a psychiatrist at T.W. Ponessa. Tr. 205-206. Dr. Garloff performed a mental status examination and found that Crankfield's affect was appropriate; her speech was spontaneous and relevant; her psychomotor activity was good; her vegetative functioning revealed middle insomnia and variable appetite; she had no suicidal or homicidal ideations or plans; she endorsed seeing shadows, hearing doorbells, babies crying, and voices telling her how to hurt people; she had racing thoughts; she

reported that voices have been present for approximately one year; and her insight and judgment were "thusly affected." Tr. 205. Dr. Garloff's diagnostic impression was that Crankfield suffered from major depression, recurrent, moderate, and cannabis abuse, continuous. Tr. 206. Dr. Garloff could not rule out the possibility that Crankfield suffered from major depression, recurrent, severe, with psychotic features and could not rule out the possibility that she suffered from psychosis. Id. Dr. Garloff gave Crankfield a GAF score of 40. Id.

On August 11, 2009, Crankfield had a follow-up appointment with Dr. Garloff. Tr. 263-264. Crankfield reported that she was no longer taking Celexa from her family doctor, just Risperdal,[17] and that she was feeling better but having trouble sleeping. Tr. 263. Dr. Garloff performed a mental status examination which was essentially normal except for reporting that Crankfield was having difficulty sleeping and she became angry because she was skipped over in the waiting room. Id. Dr. Garloff's diagnosis was that Crankfield suffered from major depression, recurrent, moderate, and cannabis abuse, continuous. Id. Dr. Garloff could not rule out the possibility that Crankfield suffered from major depression, recurrent, severe, with

_____

17. Risperdal is an antipsychotic medication used to treat schizophrenia and symptoms of bipolar disorder. Risperdal, Drugs.com, http://www.drugs.com/risperdal.html (Last accessed November 6, 2013).

psychotic features and could not rule out the possibility that she suffered from psychosis. Id. Dr. Garloff prescribed the medication Risperdal, formally discontinued the prescription for Celexa and started Crankfield on a therapeutic trial of Trazodone.[18] Id.

On September 9, 2009, Crankfield had an appointment with Stephanie J. Fry, a mental health case worker at the Dauphin County Case Management Unit. Tr. 278. During that encounter, Crankfield signed a document entitled "Drug and Alcohol Treatment Availability Acknowledgment Form" in which she stated she did not need a referral for drug or alcohol treatment and that she had "no history of drug or alcohol dependence."[19] Id. The form was also signed by Ms. Fry. Id.

Ms. Fry testified at the administrative hearing held on October 4, 2010, that Crankfield had been on her caseload at the Case Management Unit for approximately a year and four months or since about June, 2009. Tr. 38. She also indicated that she met with Crankfield about once a month. Id. The administrative record

---

18. Trazodone is an antidepressant medication. Trazodone, Drugs.com, http://www.drugs.com/trazodone.html (Last accessed November 6, 2013).

19. The administrative law judge mischaracterized the statement on the form when questioning Ms. Fry at the administrative hearing. He stated to Ms. Fry that she "wrote down that a referral was not needed because she had no history of use[.]" Tr. 45.

does not contain, however, notes documenting those monthly sessions.

Ms. Fry testified that Crankfield was going to Pathstone located in Harrisburg which is a job training and employment service and that Pathstone referred Crankfield to the Case Management Unit because of mood swings, irritability and conflict with staff and other participants at Pathstone related to Crankfield's lack of social functioning, problems with concentration, persistence and pace and often failing at completing tasks because of her lack of concentration. Tr. 38-39 and 295. The administrative record does not contain Crankfield's records from Pathstone just merely a letter from Caroline Steele, Program Caseworker. Tr. 295. Ms. Steele noted that Crankfield attended the program from February 2009 to May 2009 but failed to complete it. Id.

Ms. Fry also testified that she observed Crankfield's irritability, lack of social functioning and problems with concentration and that it was hard "to imagine her holding down a job just because the nature of her disorder is such that she becomes highly irritable." Tr. 39-43. Ms. Fry further testified that Crankfield missed appointments but felt that her absence was not intentional but because of her condition. Tr. 40. Ms. Fry testified that when Crankfield is on her medication she does better but that it is "not a complete fix for her, unfortunately"

and she still has periods of isolating herself and lack of concentration. Tr. 40-42. Ms. Fry testified that "folks with bipolar disorder" use marijuana to "calm them down" and acknowledged that she was aware that Crankfield used marijuana in the past to self-medicate but that Crankfield had denied using marijuana for 5 to 6 months and had no reason to doubt her denial because when visiting Crankfield's home[20] she did not observe her smoking or smell the odor of marijuana. Tr. 43. Since the administrative hearing was held on October 4, 2010, the last use by Crankfield based on her assertion that she had not used marijuana for 5 to 6 months would have been at about the end of April, 2010.

On September 28, 2009, Jonathan Rightmyer, Ph.D., a psychologist, reviewed Crankfield's medical records on behalf of the Bureau of Disability Determination. Tr. 228-243. After merely reviewing the medical records,[21] Dr. Rightmyer concluded that Crankfield suffered from bipolar disorder, not otherwise specified, major depressive disorder, and a history of cannabis abuse. Tr. 231, 236 and 243. Dr. Rightmyer further found that Crankfield was moderately limited in her ability to (1) carry out

---

20. Records of these home visits are not part of the administrative record.

21. Dr. Rightmyer did not specify the medical records he reviewed.

detailed instructions, (2) maintain attention and concentration for extended periods, (3) work in coordination with or proximity to others without being distracted by them, and (4) interact appropriately with the general public. Tr. 241-242. With regard to Crankfield's ability to function in a work environment, Dr. Rightmyer stated as follows:

> The claimant can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks. Stress exacerbates her symptoms. Furthermore, she can make decisions. She is able to carry out very short and simple instructions. She experiences social anxiety and discomfort around strangers. Her ability to function socially is impaired secondary to her extreme emotional lability. Additionally, she can function in production oriented jobs requiring little independent decision making. She evidences some limitation in dealing with work stresses and public contact. Moreover, she retains the ability to perform repetitive work activities without constant supervision. . . . The claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting form her impairment.

Tr. 243.

After Dr. Rightmyer's medical records review,[22] Crankfield on November 3, 2009, had an appointment at T.W. Ponessa with Dr. Garloff. Tr. 261-262. At this appointment, Crankfield complained of headaches, nausea and muscle pain. Tr. 261. After conducting a clinical interview and mental status examination, Dr. Garloff's diagnosis was that Crankfield suffered from major

---

22. Dr. Rightmyer did not specify the medical records he reviewed.

depression, recurrent, moderate; cannabis abuse continuous; and he could not rule out major depression, recurrent, severe, with psychotic features. Tr. 261. Dr. Garloff did note a slight improvement in her condition and gave her a GAF score of 45. Id. Dr. Garloff continued Crankfield's prescription for Risperdal and Trazodone. Tr. 262. He also started Crankfield on Cogentin which is used to counteract the side effects (which include muscle pain or stiffness) of antipsychotic medicines.[23] Id.

On November 24, 2009, Crankfield had an appointment at T.W. Ponessa with Yury Yaroslavsky, M.D. Tr. 259-260. After conducting a clinical interview and mental status examination, Dr. Yaroslavsky modified Crankfield's diagnosis to bipolar disorder, not otherwise specified and he could not rule out psychosis, not otherwise specified. Tr. 259. He gave Crankfield a GAF score of 45, representing a serious impairment. Id. Dr. Yaroslavsky continued Crankfield on the medications Risperdal, Trazodone and Cogentin (Benztropine) and advised Crankfield to maintain abstinence from substances of abuse and continue to see her psychotherapist at T.W. Ponessa. Tr. 259-260.

On January 8, 2010, Crankfield was discharged from outpatient therapy at T.W. Ponessa because of "inconsistent attendance." Tr. 258. The attendance records of T.W. Ponessa

23. Cogentin, Drugs.com, http://www.drugs.com/cdi/cogentin.html (Last accessed November 6, 2013).

indicate that from June 3, 2009 through January 8, 2010, out of 18 scheduled therapy sessions, Crankfield missed 9 sessions. Tr. 265-266. At discharge her medications were Cogentin, Risperdal and Trazodone and it was recommended that "she continue with future outpatient therapy services" and that she continue meeting with Dr. Yaroslavsky for medication management. Tr. 258.

On July 21, 2010, Crankfield underwent a psychiatric evaluation at T.W. Ponessa performed by Dr. Yaroslavsky. Tr. 255-257. After conducting a clinical interview and a mental status examination, Dr. Yaroslavsky's diagnostic impression was that Crankfield suffered from bipolar disorder, not otherwise specified, and panic disorder with agoraphobia. Tr. 255-256. Dr. Yaroslavsky could not rule out the possibility that Crankfield also suffered from psychotic disorder, not otherwise specified, and learning disability, not otherwise specified. Id. He gave Crankfield a GAF score of 45-50. Id. During the mental status examination, Dr. Yaroslavsky found that Crankfield was tearful and depressed; she showed somewhat avoidant eye contact; she reported "seeing shadows"; her insight and judgment seemed to be limited; her concentration appeared decreased; and she did poorly when her mathematical abilities were tested. Tr. 256. Dr. Yaroslavsky prescribed Risperdal, Trazodone and Celexa and recommended that Crankfield start individual psychotherapy. Tr. 257. Crankfield was reluctant to start individual psychotherapy. Id.

22

On September 9, 2010, Crankfield had a follow-up appointment with Dr. Yaroslavsky. Tr. 394. Dr. Yaroslavsky, after conducting a clinical interview and mental status examination, concluded that Crankfield suffered from bipolar disorder and could not rule out psychosis and gave Crankfield a GAF score of 45. Id. He continued Crankfield's current medications. Tr. 395.

On September 14, 2010, Dr. Poole completed on behalf of Crankfield a document entitled "Medical Statement Regarding the Nature and Severity of Mental Impairment(s)." Tr. 267-268. Dr. Poole found that Crankfield suffered from severe depression and bipolar disorder and had marked limitations in 9 areas of mental functioning including her ability to work with or near others without being distracted, complete a normal workday or workweek, perform tasks within a schedule, fulfill production requirements and get along with co-workers and peers, and noted the following supportive signs: mood disturbance, obsessive-compulsive behavior, sleep pattern changes, anxiety and frustration. Id. He further opined that Crankfield's impairments would cause her to miss work more than 2 times per month. Tr. 268. A vocational expert who testified at the administrative hearing indicated that if Dr. Poole's opinion was accepted Crankfield would be unemployable. Tr. 49. The vocational expert further stated that a person would have to have GAF scores consistently above fifty-one, two, three or

higher in order to sustain the unskilled work that he identified.
Id.

On January 13, 2011, Crankfield was discharged from treatment at T.W. Ponessa because of inconsistent attendance. Tr. 392-393. The discharge summary was prepared by Michelle Kassahun, a Master of Science level therapist. Id. The summary noted that Crankfield's current GAF score was 50. Id. Ms. Kassahun did not conduct a clinical interview and a mental status evaluation prior to issuing the discharge summary. In fact, the last time she saw Crankfield was on October 18, 2010, according to the discharge summary. Id.

Finally, the record contains a document (which has the date obscured by a bold copy stamp) signed by Hallie F. Rosen, MSW, a mental health professional at the Case Management Unit in Dauphin County. Tr. 271. Ms. Rosen apparently evaluated Crankfield and found that she suffered from major depressive disorder with psychotic features and gave her a GAF score of 45. Id. The document was most likely prepared in April or May of 2009 because the document includes a referral to T.W. Ponessa and Crankfield underwent an intake evaluation at T.W. Ponessa in June of 2009. Tr. 265.

**DISCUSSION**

The administrative record in this case is 400 pages in length consisting, inter alia, of vocational and medical records.

The Court has thoroughly reviewed that record. Crankfield argues, inter alia, that the administrative law judge erred (1) by not acknowledging and evaluating relevant evidence that supported Crankfield's inability to sustain work activity, (2) by not acknowledging and evaluating all medically determinable impairments established by the record, and (3) by failing to appropriately evaluate Crankfield's credibility. Those arguments have substantial merit. The Court will address Crankfield's argument in conjunction with reviewing the ALJ's decision.

The administrative law judge at step one of the sequential evaluation process found that Crankfield had not engaged in substantial gainful work activity since June 24, 2009, the application date. Tr. 16.

At step two, the administrative law judge found that Crankfield suffers from the following severe impairments: "mood disorder and substance abuse disorder[.]" Id.

At step three of the sequential evaluation process, the administrative law judge found that Crankfield's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16-17.

At step four of the sequential evaluation process, the administrative law judge found that Crankfield had no past relevant work and had the residual functional capacity to engage in a limited range of unskilled, light work. Tr. 17. Specifically,

25